[1] Reported in 209 P.2d 284.
The first-named defendant in this action, Benevolent and Protective Order of Keglers, Lodge No. 1, is a corporation organized and existing under and by virtue of the laws of the state of Washington, having its principal place of business in the city of Spokane. Article III of the articles of incorporation of the defendant above named reads as follows:
"The object for which this corporation is formed is to establish a fraternal order for the promotion of athletic, social and charitable ends for the mutual benefit of its members and the betterment of society in general."
In connection with its activities, the corporation operated a club in the city of Spokane, which was patronized by its members.
Perry Pring and the other plaintiffs in the action are musicians who, for some time prior to September 1, 1947, had been employed by the defendant corporation as an orchestra to furnish music four nights a week at the club rooms conducted by the corporation.
Plaintiffs instituted this action against the corporation and certain individuals named in the complaint as officers or directors of the corporation, who, the complaint alleged, claim some interest in the corporation or its assets.
By their complaint, plaintiffs alleged that, September 1, 1947, through Perry Pring, their representative, they entered into a contract of employment with the defendant corporation. A copy of the contract is attached to the complaint, purporting to have been executed on behalf of the *Page 512 
corporation by Earl McInroe, stated in the complaint to have been, at the date referred to, the "duly appointed and acting manager" of the corporation. The complaint further alleged that plaintiffs entered upon the performance of the contract and complied with the terms thereof until January 8, 1948, when the directors of the corporation closed the club rooms and notified plaintiffs that their services would no longer be needed, and, thereafter, refused to make payments to plaintiffs in accordance with the terms of the contract. Plaintiffs demanded judgment against defendants, by way of damages, in the sum of $10,230.
By their answer, defendants admitted the corporate existence of the first-named defendant, as alleged in the complaint (which defendant will be hereafter referred to as B.P.O.K.), and that the individual defendants were officers of or interested in the corporation or its assets. Defendants denied the execution, by the corporation, of the contract relied upon by plaintiffs, and denied that defendants had breached any contract with plaintiffs and that any sum whatever was due to plaintiffs from defendants.
By way of a first affirmative defense, the defendants pleaded portions of the bylaws of the corporation, which provided that the corporate affairs should be managed by a board of five directors; that no expenditures of any kind, nature, or description should be made except with the approval of the board of directors; and that the directors should examine and audit bills against the corporation, and affirmatively alleged that the bylaws made no other provision for the making of binding contractual obligations on behalf of the corporation. Defendants also pleaded that the contract upon which plaintiffs relied was not authorized by the board of directors and was not binding upon the corporation; that Earl McInroe, who signed the contract, was temporarily employed by the corporation as manager of the club, which was, for a time, operated as a portion of the activities of the corporation; and that McInroe had no authority from the board of directors to enter into the contract referred to, on behalf of the corporation. *Page 513 
By their reply, plaintiffs denied the affirmative matter contained in defendants' answer.
The action was tried to the court, sitting without a jury, and resulted in the entry of findings of fact and conclusions of law in favor of the defendants, followed by a judgment dismissing the action with prejudice.
Thereafter, plaintiffs moved for a new trial, and, upon denial of this motion, appealed to this court.
The trial court found the corporate existence of B.P.O.K., and that the appellants are musicians, composing an orchestra under the leadership of Perry Pring, who, as a representative of appellants, presented to Earl McInroe, who was then acting as "manager" for the corporation, the document upon which this action is based, which was admitted in evidence on the trial as exhibit No. 1. By finding No. 3, the court found, inter alia:
"That at the time of the entry into said contract and for some time prior thereto, said Perry Pring had knowledge of the fact that the affairs of said lodge were conducted and managed by a Board of Directors and that in spite of such knowledge he secured the signature of said Earl McInroe to said Exhibit A attached to the complaint, being exhibit 1 in this case, he well knowing that the said Earl McInroe was acting without authority from such Board of Directors."
Findings Nos. 4, 5, 6, and 7 read as follows:
"(4) That at the time of the execution of said Exhibit A attached to the complaint, being Exhibit 1 in this case, the said Earl McInroe had no authority to execute said instrument and that the affixing of his signature thereto did not constitute a binding contract on said lodge, and said Exhibit A attached to the complaint herein, being Exhibit 1 in this case, was and is void.
"(5) That the Board of Directors of said corporation did not at any time ratify, approve or adopt said Exhibit A attached to the complaint, being Exhibit 1 in this case.
"(6) That any employment which the plaintiffs may have had was a hiring at will, subject to termination at the will of either of the parties.
"(7) That the employment of the plaintiffs was terminated on or about the 8th day of January, 1949 [1948], and that at the time of said termination all credits due from *Page 514 
said lodge to the plaintiffs were paid to them. That the defendant lodge is not indebted to the plaintiffs in any sum or sums whatsoever."
The trial court then concluded that the action should be dismissed, with costs against appellants, and the judgment dismissing the action was signed July 10, 1948, and filed July 13, 1948.
Appellants assign error upon the court's findings Nos. 3, 4, 5, and 6; upon the court's conclusion of law that the action should be dismissed; and upon the entry of the judgment dismissing the action.
It appears from the record that the B.P.O.K., corporation respondent, was formed in 1939, by persons who had formerly conducted an athletic club, largely for the purpose of indulging in the sport of bowling.
Since 1938, appellant Perry Pring has been the leader of an orchestra, which was first employed by B.P.O.K. New Year's Eve, 1941. A short time after this date, B.P.O.K. regularly employed Pring and his orchestra, the employment continuing until early in January, 1948.
It further appears that the activities of the corporation were very much curtailed during the month of June, 1947, because of the suspension of the club's 23-T liquor license by the appropriate state authority, June 5, 1947. July 11, 1947, the suspended license was reinstated on a temporary basis. The club was closed January 8, 1948, after its liquor license had been revoked.
July 12, 1947, a written contract was entered into, having been accomplished on a printed form entitled "Contract Blank, AMERICAN FEDERATION OF MUSICIANS," whereby five musicians (not named), "under the leadership of Perry Pring," were employed by the corporation for the period "July 12, 1947 to September 1, 1947, Inclusive. Hours of Employment Nine P.M. to Twelve A.M., Four nights weekly," at the agreed price of three hundred ten dollars per week. At the end of the agreement appears the following:
 "Name of Employer [Signed] Earl McInroe. "Accepted by Employer [Signed] Earl McInroe." *Page 515 
The foregoing contract was entered into pursuant to appropriate action by the board of directors (or trustees) of B.P.O.K., as required by Articles II and XVIII of the corporation's bylaws, which read as follows:
"ARTICLE II. BOARD OF TRUSTEES. The affairs of this fraternity shall be managed by a Board of five trustees who shall be elected and shall hold office as provided in the Articles of Incorporation, and in such manner as to at all times maintain in office a Board of Trustees, a majority of whom shall have at least two years' actual experience in said office.
"ARTICLE XVIII. DUTIES OF THE TRUSTEES. Among other things it shall be the duty of the trustees to take an inventory of all furniture and fixtures and other physical property of the lodge at least once each year, and oftener if required by the presiding officer of the lodge, and they shall deliver same to the presiding officer. They shall examine, investigate and audit all bills and shall report to the lodge their recommendation as to payment, except such fixed current items such as charges for rent, telephone, et cetera, which may be paid by the Secretary without formal approval by the Board of Trustees. A majority of the Board of Trustees may act. They shall perform all other duties required of them by the laws and ritual of the order."
It may be observed that, by the bylaws, the directors were vested with complete control over the affairs of the corporation, save as to auditing bills for "fixed current items," which charges "may be paid by the Secretary without formal approval by the Board."
By its express terms, the agreement above referred to expired September 1, 1947. The authorization of this contract by the board of directors is indicated by the following excerpt from the "MINUTES OF SPECIAL MEETING OF B.P.O.K. No. 1 HELD JULY 12, 1947":
"On motion by Mr. Cooley and second by Dr. McGilchrist, the Manager was authorized to execute a contract with Perry Pring to engage his orchestra composed of five members to play 4 nights weekly for a period July 12 to September 1, 1947 at a rate of $310.00.
"The vote on this motion was as follows: Yes — Dr. McGilchrist, Mr. Cooley and Mr. Sheets. NOT VOTING — H.H. Higgins." *Page 516 
Concerning the contract of July 12, 1947, Mr. Pring testified, on cross-examination, as follows:
"Q. The first contract which you have had anything to do with is the contract of the 12th of July, 1947, being Exhibit 6, isn't that correct? A. That is right. Q. And then before you entered into that contract you saw to it that the board of directors passed a resolution authorizing its entry, did you not? A. Yes, sir. Q. And you knew that it was necessary to have a board of directors authorize, at least initially authorize the entry into the contract; you knew that, didn't you? A. Yes, sir."
From the testimony above quoted, it appears that Mr. Pring understood that, to accomplish a contract binding upon the corporation, appropriate action by the board of directors was necessary.
The contract relied upon by appellants in this action, which was introduced in evidence, was prepared upon a blank form similar to that used in preparing the July contract. It bears date September 1, 1947. Following the words "Name of Employer" appears, in type, "Earl McInroe," whose handwritten signature appears on the line following the words "Accepted by Employer." The contract purports to show a hiring of Mr. Pring's orchestra by the corporation from "September 1st, 1947, to September 1st, 1948, Inclusive. Hours of Employment Nine P.M. to Twelve P.M. Four nights weekly," at three hundred ten dollars per week, payable weekly. Concerning this contract, Mr. Pring testified, on cross-examination, as follows:
"Q. Now, calling your attention to Plaintiffs' Exhibit 1 for Identification, it is a fact, is it not, that the board of directors did not authorize Mr. McInroe to enter into Exhibit 1, is that right? A. No, sir. I have no knowledge whether they authorized it or not. Q. Well, you know that they did not authorize the entry into this contract with you, do you not? A. No. I do not. MR. GARVIN: Just a minute. I object to that as being argumentative. The exhibits in evidence speak for themselves. THE COURT: Well, the witness may answer if he knows whether or not the authorization was made. A. I do not know, your Honor, whether this contract was authorized by the board of directors *Page 517 
or not, between the manager and the board of directors."
From the minute book of the corporation, it appears that the board of directors met July 19, August 4, August 11, August 13, and August 28, 1947. The minutes of these meetings disclose nothing concerning any contract between the corporation and the appellants.
The board of directors met again September 5, September 14, and September 27, 1947. At the latter meeting, Perry Pring was appointed "Acting Manager until a permanent manager could be engaged," and was instructed, among other duties, to "Accept the resignation of Earl McInroe." The minutes state that the board "held a two-hour discussion on the expenses of the club and the elimination of all possible expenses." It was also voted that "the orchestra play only four nights a week."
The minutes of none of these meetings disclose any reference to a contract between the corporation and Mr. Pring or the orchestra for furnishing music.
Four members of the board of directors of the corporation testified at the trial, each stating that he was a member of the board in August and September, 1947.
C.H. Sheets testified that, at a meeting of the board (held September 27, 1947), at which Mr. Pring was present, there was a general discussion of the matter of a further contract between the corporation and Mr. Pring. The witness testified that he stated at that time that he was unwilling to enter into any contract which did not contain a provision that it could be "voided within two weeks' time," and that it was not until some time after the meeting that he learned that Mr. McInroe had entered into the contract above referred to with Mr. Pring.
W.B. Cooley testified that he was a member of the board, and that the board had never authorized the execution of the contract of September 1, 1947.
Dr. N. McGilchrist, member of the board, testified that he first learned of the purported contract in October or November, 1947. *Page 518 
H.H. Higgins testified that he was a member of the board of directors in 1947, and that the first time he learned of the purported contract in question was in November or December, 1947, when he and Mr. Pring went to Seattle and the latter told him that he had the contract. He also testified that at no meeting of the board of directors prior to September 1, 1947, had he ever heard any mention of such a contract. He testified that, at a meeting of the board in September or October, Mr. Pring had stated that "he had to have a contract, the Musicians' Union demanded a contract." The witness testified that he decidedly objected to the making of any such contract. Mr. Higgins also stated that, early in January, when the possibility of continuing the club's activities was discussed, Mr. Pring had said: "Yes, it is all through now. You don't need to worry about the orchestra."
Dr. Charles A. Ham, called as a witness by appellants, testified that he was an officer of respondent corporation but not a director, and that he attended the meeting of the directors held September 27, 1947, at which the purported contract with appellants was discussed. The witness testified that there was argument among the directors concerning the orchestra; that Mr. Pring stated that appellants had the contract referred to, and that one of the directors said: "Well, there is a contract here all right and it is an authentic contract and it will have to be taken care of." The witness added:
"After they had read this contract he brought out, they said, `Yes, he has a contract all right and we will have to stand by it.' Now, that is the way I remember it. That is quite a while ago, naturally a little bit hard to recall word for word."
Appellants rely upon this testimony as showing a ratification of the contract by the board of directors, but the testimony is in conflict with that given by the directors and is nowise sufficient to support appellants' contention.
Concerning the meeting September 27th, three members of the board, including Mr. Sheets, testified that they did *Page 519 
not remember whether or not the contract signed by Mr. McInroe was shown to the directors. The witness Sheets testified that the matter was discussed, and that he said that, if the corporation had made a contract with appellants, it should be upheld. From the testimony of this witness, above referred to, it appears that Mr. Sheets was strongly opposed to the making of any contract with appellants which did not contain a provision to the effect that it could be terminated upon two weeks' notice.
There are some discrepancies in the testimony of respondents' witnesses as to what happened at meetings of the board, but it nowhere appears that the board or any member thereof authorized or favored the execution or ratification of any such contract as that upon which appellants rely. One member of the board expressed the view that the corporation should abide by a lawful contract, and a contract with the provision for termination thereof on two weeks' notice was discussed, but no such contract was ever authorized.
In the course of his examination in the case at bar, Mr. Pring testified:
"Q. So that there is no other meeting or no other place where the board ratified and confirmed this contract, except at that meeting of the 27th of September, is that quite true? A. It is quite true."
Perry Pring was called to testify before an interim committee appointed by the state legislature, and did so testify at a public meeting held at the Spokane county courthouse about the middle of December, 1947. A court reporter, who had taken down in shorthand the questions propounded to Mr. Pring before the interim committee, and Mr. Pring's answers to the questions, testified that the following had occurred during Mr. Pring's examination:
"A. I guess this first question covers it: `And regardless of the financial condition of the club this $310.00 a week continues for this year of your contract, or can it be terminated?' Answer: `I could terminate it.' MR. GARVIN: That is by Mr. Pring? THE WITNESS: That is by Mr. Pring. A. Question by Mr. Lally: `Can the club terminate it?' *Page 520 
Answer: `I believe the club could terminate it.' Question: `Is it a written contract?' Answer: `That contract is signed by Mr. McInroe, the former manager. When it was made out Mr. McInroe was manager, but I don't believe the contract has ever been approved by the board of directors.' Question: `Mr. McInroe signed that contract?' Answer: `That is right.' Question: `Your prior contract had a clause in it that it could be terminated on some kind of notice, didn't it?' Answer: `That is right.' Question: `A week's or something?' Answer: `I believe it was two weeks. I have been opposed at all times to a contract for the band, but the Union requires that a contract be had and filed with the Musicians Union.'"
After appellant Pring had testified in rebuttal as a witness on his own behalf, the following occurred:
"Q. [By the court.] Do you wish to make any explanation of those statements at this time? A. Yes, your Honor. Q. Well, you may do so. A. Referring to the question that was asked at this hearing pertaining to whether I could violate — whether I could break this contract or whether the club could break this contract, I really wasn't giving any consideration to a contract. I do not know to this day whether or not the club can break this contract; that is to be determined here. And I didn't know I could break it. I didn't know whether I could break the contract or not. I believe that was in substance the answer I gave at this hearing. That is in regards to the question as to whether or not I or the club could break this contract. I recall, and of course it is emphasized on my rehearing what was said — I recall now this question pertaining to breaking of this contract, and if I would have to give that testimony again, I am quite sure I would give the same testimony. I could break it but I believe that would have to be settled, your Honor, in court; I don't know. . ..
"Q. When did you come to the conclusion that the contract should be approved? A. Should be approved? Q. Yes. A. By the board of directors? Q. Yes. A. I have never at any time assumed that the contract had to be approved by the board of directors. Q. You made that statement, it had not been approved and could therefore be broken? A. The contract was signed by Mr. McInroe. I had always considered that was sufficient approval in itself. The signature of the manager on a contract like that, and I have never engaged in any contract with the board of *Page 521 
directors where the board of directors signed the contract. The acting manager took the authority to sign the contract. There is no space under my contract for the signatures of many names such as the board of directors. There is the signature there for the employer, and the employer we always consider as the manager."
Of course, it was never suggested that the directors should sign the contract.
Appellants' counsel, in their reply brief, argue that Mr. Pring's testimony before the interim committee is of minor importance in the case at bar, as, when so testifying,
"Mr. Pring, as manager, undoubtedly felt a responsibility to his employer and undoubtedly sought to give the most favorable information possible, and that he probably unconsciously colored his testimony to bring about that effect. But what is so damning about that testimony? He merely expressed his opinion at that time that `I do not believe the contract has ever been approved by the Board of Directors.' Such statement and such opinion proved to be incorrect and its incorrectness was established when the facts were investigated in preparation of the instant case."
We cannot weigh Mr. Pring's testimony before the interim committee as lightly as is suggested by appellants' counsel.
The closing of the club in January, 1948, was the result of the permanent revocation, in December, 1947, of its 23-T liquor license, which rendered further operation of the club impossible.
Appellants state three propositions: first, that, if Mr. McInroe had no legal authority to enter into the contract in question, he had been vested with apparent authority to enter into such an engagement; second, that the corporation's board of directors ratified the contract at its meeting held September 27, 1947, and, third, that, if their acts did not amount to a legal ratification, such acts at least estopped the corporation from later denying the validity of the contract.
Respondents argue that the corporation was not a party to the contract and had not granted any actual or apparent authority to Mr. McInroe to make the contract, and that, from the evidence, it should be held that the contract was *Page 522 
never ratified by the corporation, and that appellants did not rely upon any apparent authority on the part of Mr. McInroe or upon any supposed estoppel operating against the corporation.
[1] The record does not support appellants' contention that the directors, at their meeting September 27th, ratified any contract which Mr. McInroe made with appellants. Apparently, the matter was discussed at the meeting, but no action was taken by the directors, and casual remarks made by the individual directors, as shown by the statement of facts, are entirely insufficient to support appellants' argument that the contract, upon which they rely, was adopted or ratified by the corporation. It does not appear that appellants continued playing at the club in reliance upon any such ratification, as Mr. Pring evidently, at all times, understood that appellants had no contract with the corporation to continue their services until September 1, 1948.
[2] Beyond doubt, Mr. McInroe had no power to execute the contract on behalf of the corporation. The evidence that he had no such authority is clear and positive.
The judgment appealed from was rendered on the merits of the case, and not upon any technical grounds.
[3] In determining issues such as those presented in the case at bar, this court will examine the record for the purpose of ascertaining whether the findings entered by the trial court are sustained by a preponderance of the evidence.
In the case of Borde v. Kingsley, 76 Wn. 613, 620,136 P. 1172, we said:
"The rule is that this court will go into the record for the purpose of finding out whether the findings are sustained by a preponderance of the evidence. If we find that they are not, we will reverse the judgment. If we find that they are, or from an inspection of the whole record we are unable to say that the evidence does not preponderate in favor of the appealing party, the trial judge having had the witnesses before him and marked their demeanor, we will sustain the findings and judgment. . . . But it may be understood henceforth that this court will sustain the findings and judgment of the trial court when, and when *Page 523 
only, we can say that we are satisfied that the evidence does not preponderate against the findings."
In the case of Bleiler v. Wolff, 23 Wn.2d 368, 375,161 P.2d 145, we said:
"This case having been tried to the court, we are bound to accept the findings as verities, unless from the record it appears that they are contrary to the clear preponderance of the evidence."
[4] The record does not support appellants' contention that any estoppel operates in their favor. Neither do we find in the record anything which would justify a holding that the corporation, through its board of directors, ratified the contract in question. Whether or not there was any such ratification, is a question of fact, and the evidence on this phase of the case supports the findings of the trial court.
The board of directors of the corporation never authorized Mr. McInroe to enter into the contract with appellant; and, as the corporation is not estopped from denying responsibility under the contract, and never ratified it, the trial court was correct in entering judgment dismissing the action.
The judgment appealed from is affirmed.
JEFFERS, STEINERT, MALLERY, and HILL, JJ., concur. *Page 524